IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

LARSEN V. FERENCE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

MAUREEN F. LARSEN, APPELLEE,

V.

STEVEN FERENCE, APPELLANT.

Filed September 24, 2024.    No. A-24-036.

Appeal from the District Court for Sarpy County: MICHAEL A. SMITH, Judge. Affirmed.

Sarah E. Cavanagh, of Houghton, Bradford & Whitted, P.C., L.L.O., for appellant.

Stephen D. Mossman, of Mattson Ricketts Law Firm, and Dallas D. Jones, Jr., Senior Certified Law Student, for appellee.

PIRTLE, Chief Judge, and ARTERBURN and WELCH, Judges.

ARTERBURN, Judge.

## INTRODUCTION

Steven Ference appeals from an order of the district court for Sarpy County extending an ex parte harassment protection order entered against Ference for the protection of Maureen Larsen until November 22, 2024. Ference argues that there was insufficient evidence to support issuance of the protection order. Upon our de novo review of the record and giving deference to the district court's determination of witness credibility, we affirm the decision of the district court.

## BACKGROUND

In November 2023, Larsen filed a petition and affidavit to obtain a harassment protection order, pursuant to Neb. Rev. Stat. § 28-311.09 (Cum. Supp. 2022). In her affidavit, Larsen alleged numerous occurrences of harassment by Ference, who is her neighbor, beginning in July 2020. These allegations included Ference's actions towards herself and members of her immediate

- 1 -

family. The initial incident which caused Larsen concern was when Ference asked her to represent him in a legal action he had with his employer. Larsen advised Ference that she was unable to represent him or give him legal advice. Shortly thereafter, Ference approached her in her driveway waving a document and demanding that she represent him. At about that time, Ference's wife Bernadette drove up and told him to get in the car. Bernadette later apologized for his behavior. Around the time that these events occurred, the relationship between Larsen and Ference had deteriorated causing Larsen to rescind her verbal permission for Ference "to cross over the southeast portion of [her] farmland as a shortcut to [his] parcel of farmland." The recission of permission occurred after Ference had "removed, damaged, and destroyed numerous trees on [her] property."

In detailing the allegations in Larsen's petition and affidavit, we focus on those allegations which concern Ference's behavior toward Larsen, as Larsen only requested a protection order for herself, not for other members of her family. Larsen alleged two occurrences of harassment in 2020. In July 2020, she indicated that she was jogging on a trail on her property when she observed Ference "driving up a road that accesses the southern portion of [her] farmland parcel." Ference "stopped his tractor on the corner of [Larsen's] property, stood up, and started manically yelling and pointing at [her]." Larsen indicated that she continued to jog on the trail, which led into a wooded area. When she entered the wooded area, Ference "stepped out from behind a large tree that was on his property immediately east of the trail." According to Larsen, Ference was only about 10 feet away from her at this time. Ference then began waving his arms and screaming at Larsen. Larsen indicated that she was "terrified" by Ference's actions.

Larsen indicated that, ultimately, Ference's wife, Bernadette, arrived while Ference was still screaming at her and led Ference away. When Larsen spoke with Bernadette later on, Bernadette blamed Ference's behavior on his "mental health issues."

In her affidavit, Larsen also alleged that soon after the July 2020 incident, she observed that one of the large trees on her property had been vandalized with a hatchet. This tree is located near the border between her property and Ference's property. Larsen believed that Ference was responsible for the vandalism because she has seen Ference on his property with a hatchet. Because of her belief that Ference had vandalized the tree, Larsen installed cameras on the trail on her property. The camera footage showed Ference repeatedly trespassing onto Larsen's property. Larsen eventually called law enforcement, and Ference was cited for trespassing, but was never prosecuted for the offense.

Larsen alleged an additional two occurrences of harassment in 2021. In September 2021, Larsen indicated that she observed Ference standing on his cattle fence, facing her house, and watching her mow her lawn. When Larsen drove her riding lawn mower to her farmland parcel, Ference drove his truck to the fence line of her parcel and began singing and shoveling manure out of the back of his horse trailer in the direction of Larsen. In November 2021, Larsen alleged that a truck on Ference's property followed her along the fence line while she was jogging on the trail. As Larsen ran down the wooded portion of the trail, Ference exited the truck with a rifle and began pacing along the fence line, near Larsen. Larsen indicated that she was "terrified" by this occurrence.

In her affidavit, Larsen alleged that in April 2022, she was walking her dog along the trail when Ference began following her on his tractor. After following her for a time, Ference got off

the tractor and followed her on foot while screaming the words, "Good Friday" and "Happy Easter" and telling Larsen to come towards him. In November 2023, approximately 1 week before Larsen filed her petition and affidavit, she alleges that Ference drove past her while she was walking on her driveway. As he approached, he rolled down his window, stuck his head out, and "screamed . . . wildly waiving his hands."

In her affidavit, Larsen also alleged multiple undated occurrences of harassment by Ference. She indicated that in the past few years, Ference has swerved towards her in his vehicle while she was jogging on a county road near her home. Ference has also followed Larsen in his vehicle while she is jogging on the county road. He "will often drive past [her] and then make a U-turn in the road to pass [her] a second time, all while screaming and wildly waving his hands and arms at her." Larsen indicated that she has observed Ference sitting in his vehicle watching her and her family.

In light of the allegations contained in Larsen's affidavit, the district court issued an ex parte harassment protection order against Ference. Among other restrictions, the protection order prohibited Ference from contacting, harassing, threatening, or disturbing the peace of Larsen. Ference subsequently requested a show cause hearing before the district court on the ex parte protection order. A hearing was held in December 2023.

At the hearing, both Larsen and Ference appeared with counsel. Larsen testified regarding the allegations contained in her petition and affidavit. In response to questions from the trial judge, Larsen affirmed that she signed the petition and affidavit in support of her petition under oath and that everything contained in the petition and affidavit was true and correct to the best of her knowledge. The court then received the petition and affidavit into evidence.

Ference's counsel was then permitted to offer evidence to contradict the allegations in the petition and affidavit. Ference first called Bernadette to testify. Bernadette testified that she and Ference had been neighbors to the Larsens since 2004. They had a "very good" relationship with each other until the summer of 2020. This relationship included her and Ference regularly waving and stopping to talk to the Larsens. Since 2020, she and Ference have gone out of their way to avoid the Larsens.

The relationship began to deteriorate as a result of Ference's decision to replace a fence that bordered the two properties. The Larsens initially agreed to pay for half of the fence and Larsen's husband and son assisted Ference with building a portion of the fence. However, in the course of replacing the fence, Ference had to cut down two trees on the Larsen property and additional trees on his own property. According to Bernadette, the trees on the Larsen property were cut down when Larsen's husband was present. However, Larsen was very upset about the removal of the trees. She ultimately refused to pay for half of the fence as she had previously promised and, as a result, the fence was never completed.

Bernadette testified that after the fence incident, Larsen wrapped wire around a gate owned by her and Ference and put up a 'no trespassing' sign so that they could no longer use the Larsen property to access their farmland. In addition, the Ferences received a cease-and-desist letter from Larsen's attorney regarding their use of the Larsen property. As a result of Larsen's actions, the Ferences have to drive 2 miles out of the way to access their farmland.

During her testimony, Bernadette countered some of the allegations in Larsen's affidavit. As to the July 2020 incident where Larsen alleged that Ference jumped out from behind a tree and

screamed at her while she was jogging on her trail, Bernadette indicated that she witnessed Ference and Larsen yelling at each other. She explained that she arrived in the area in order to bring a new hitch to Ference for their trailer and saw Ference and Larsen standing approximately 100 feet apart, yelling at each other. Bernadette denied telling Larsen after this incident that Ference was suffering from mental health issues, was off his medication, or was overly stressed due to COVID. Bernadette also explicitly denied that Ference was suffering from any mental health issues.

Bernadette denied that she had ever seen Ference with a hatchet on their property. Accordingly, she did not believe that Ference was the person who vandalized the tree on the Larsen property. Bernadette also denied that Ference ever carried a gun on their property. She did indicate that she and Ference have allowed others to hunt on their property. In fact, she recalled that in November 2021, when Larsen alleged that she had seen Ference on the property with a rifle, that Ference's cousin was hunting on the property and that Ference was not at home during the designated hunting weekends.

At the close of her direct testimony, Bernadette affirmatively testified that she had never seen Ference threaten, harass, or attempt to intimidate Larsen.

After Bernadette testified, Ference called his cousin, Robert Nabity to testify. Nabity testified that he hunts on Ference's property "[j]ust about every year" and that he was hunting on the property in November 2021. When he hunts, he does carry a rifle. Nabity did not recall seeing Larsen while he was hunting in November 2021.

Ference also testified on his own behalf. Ference explicitly stated that he did not intend any of his actions toward Larsen to harass or intimate her. He also indicated that he has never threatened Larsen nor tried to seriously terrify her. Ference denied that he "maniacally scream[s]" at Larsen or her family members when he passes them. He did not deny that he has waved at them before.

As to the specific occurrences alleged in Larsen's affidavit, he denied that he vandalized a tree on the Larsen property with any kind of instrument. He denied that he intended to harass Larsen when cleaning out his trailer in September 2021. Instead, he testified that he was merely cleaning out his trailer after using it. In November 2021, he did not have a gun on his property, and was, in fact, not even home when Larsen alleged that she saw him with a gun. In April 2022, he was on his property raking hay with his dog, when his dog spotted Larsen and her dog walking on the trail. Ference testified that his dog crossed the boundary fence and he called it back repeatedly. Because it was Good Friday, he recalled telling Larsen "Happy Easter." He denied that he was trying to be intimidating or harassing during this interaction. He testified that in actuality, he was just trying to be cordial.

After Ference rested, Larsen testified in rebuttal. During her testimony, she provided clarification on the events leading up to Ference's harassment and on the specific allegations in her affidavit. Larsen testified that Ference began harassing her on her trail prior to the time she rescinded her permission for him to use her property to access his farmland. She indicated that Ference began using the "shortcut" she had provided as an opportunity to harass her, including, screaming and waving his arms at her in an aggressive manner. In fact, Ference continues to scream and wave at her almost every time he sees her on the trail. Larsen testified that Ference's ongoing actions have impacted her use and enjoyment of her property and that she does not often use her

trail anymore. Additionally, when she started running on county roads, instead of the trail, Ference would drive erratically by her and swerve his vehicle into her.

Larsen provided additional details about the July 2020 incident which precipitated her telephone conversation with Bernadette regarding Ference's mental health. Larsen explained that after Ference observed her running on the trail, he hid behind a tree in a "very rural area," then jumped out at her, screaming. While there was a wire fence between them during this interaction, Larsen described Ference as being very close to her. Larsen understood Ference was upset that she did not like the fence he had recently built. According to Larsen's testimony, when she spoke to Bernadette on the telephone about this incident, Bernadette apologized and discussed Ference's mental health, his stress, and her concerns that he would "come after (Larsen) again later that day." Larsen also offered into evidence a short text exchange between she and Bernadette. In the exchange, Larsen asked "What is going on?" Bernadette responded: "I am sorry. . . Do you have a quick moment to talk?" The telephone conversation followed.

As to the April 2022 incident between Larsen and Ference, Larsen testified that it had nothing to do with Ference's dog crossing the property line onto her property. Instead, when Ference observed her on the trail, he began screaming and yelling at her in an aggressive manner. Larsen testified that the incidents of harassment by Ference are becoming more frequent.

Larsen's husband also testified at the show cause hearing. He generally indicated that he had witnessed Ference's "maniacal" behavior towards Larsen and other members of their family.

Following the hearing, the district court entered an order continuing the ex parte harassment protection order issued on November 22, 2023. The protection order was to remain in effect for one year from the date of its original entry.

Ference appeals.

## ASSIGNMENT OF ERROR

Ference assigns that the district court erred in determining there was sufficient evidence to enter a harassment protection order.

## STANDARD OF REVIEW

The grant or denial of a protection order is reviewed de novo on the record. *Diedra T. v. Justina R.*, 313 Neb. 417, 984 N.W.2d 312 (2023). In such de novo review, an appellate court reaches conclusions independent of the factual findings of the trial court. *Id*. However, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of facts rather than another. *Id*.

## ANALYSIS

Harassment protection orders are issued pursuant to Neb. Rev. Stat. § 28-311.09 (Cum. Supp. 2022), which provides in relevant part:

> Any victim who has been harassed as defined by § 28-311.02 may file a petition and affidavit for a harassment protection order .... Upon the filing of such a petition and affidavit in support thereof, the court may issue a harassment protection order without bond enjoining the respondent from (a) imposing any restraint upon the person or liberty of the

petitioner, (b) harassing, threatening, assaulting, molesting, attacking, or otherwise disturbing the peace of the petitioner, or (c) telephoning, contacting, or otherwise communicating with the petitioner.

Nebraska courts have found harassment protection orders to be appropriate when the perpetrator stalks, follows, detains, restrains, or otherwise harasses the victim on several separate occasions. *Knopik v. Hahn*, 25 Neb. App. 157, 902 N.W.2d 716 (2017). Nebraska's stalking and harassment statutes are to be construed objectively and the victim's experience resulting from the perpetrator's conduct should be assessed on an objective basis. Thus, the inquiry is whether a reasonable victim would be seriously terrified, threatened, or intimidated by the perpetrator's conduct. *Richards v. McClure*, 290 Neb. 124, 858 N.W.2d 841 (2015).

Nebraska appellate courts have recognized that the procedures at a show cause hearing might be less elaborate than those commonly used at civil trials, but at a minimum, testimony must be under oath and documents must be admitted into evidence before being considered. *Mahmood v. Mahmud*, 279 Neb. 390, 778 N.W.2d 426 (2010). Where the evidence is insufficient, the appellate courts have reversed and vacated harassment protection orders issued by lower courts. *Richards v. McClure, supra*, (insufficient evidence for protection order where petitioner or her mother did not testify); *Mahmood v. Mahmud, supra*, (insufficient evidence for protection order where there was no testimony or evidence offered); *Sherman v. Sherman*, 18 Neb. App. 342, 781 N.W.2d 615 (2010) (insufficient evidence for protection order where affidavit and exhibits were not properly admitted into evidence by trial court).

Here, there was sufficient evidence for the district court to issue a harassment protection order on behalf of Larsen and against Ference. The incidents described in Larsen's petition and affidavit detail a pattern of harassing behavior by Ference towards Larsen spanning from the summer of 2020 to the time of the show cause hearing in December 2023. According to Larsen, during this more than 3-year time period, Ference stalked her around her property and harassed her by screaming, jumping out at her, swerving his vehicle towards her, and otherwise making it impossible for her to enjoy her property and the surrounding areas. Larsen testified that Bernadette admitted that Ference's actions were fueled by his mental health issues. Bernadette then indicated that she feared that Ference would continue to harass Larsen.

We do recognize that at the show cause hearing, Ference presented evidence which characterized his interactions with Larsen differently than Larsen characterized those interactions. Such evidence indicated that Ference attempted to keep the peace with Larsen by trying to avoid her and trying to be cordial when any interaction was required. Ference denied ever trying to intimidate, harass, or threaten Larsen with his actions. However, we must also recognize that implicit in the district court's decision to continue the ex parte harassment order, is its finding that Larsen was more credible than Ference. And, as we stated above, when the credible evidence is in conflict on a material issue of fact, we consider and give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of facts rather than another. See *Diedra T. v. Justina R., supra*. Given this deference, we do not find error in the district court's decision to accept Larsen's version of events rather than Ference's version.

In his brief on appeal, Ference asserts that even if Larsen's allegations are believed, his behavior towards her was merely annoying, rather than terrifying, threatening, or intimidating, and

that annoying behavior is not sufficient to warrant the issuance of a harassment protection order. We disagree with Ference's contention. Larsen's petition and affidavit and her accompanying testimony at the show cause hearing demonstrate a pattern of behavior on Ference's part that was harassing and terrifying. He aggressively screamed and gestured at her in rural areas when she was alone. He swerved his car towards her when she was running on county roads. Ference's wife, Bernadette, told Larsen that she was worried that Ference would not stop such behaviors. Larsen's testimony indicates that she is afraid to freely use her own property. This evidence is sufficient to warrant the granting of a harassment protection order.

## CONCLUSION

We affirm the decision of the district court issuing a harassment protection order on behalf of Larsen against Ference. The testimony and evidence produced at the hearing, coupled with the allegations in Larsen's sworn affidavit, was sufficient to support the issuance of a protection order.

AFFIRMED.